# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
May 14, 2015 Session

## TENNESSEE FARMERS MUTUAL INSURANCE COMPANY A/S/O KENNETH L. COUCH v. JACKSON MADISON SCHOOL SYSTEM BOARD OF EDUCATION

### Appeal from the Circuit Court for Madison County
No. C13114     Kyle Atkins, Judge

_____

### No. W2014-02218-COA-R3-CV – Filed June 15, 2015
_____

This case arises from a non-contact accident between a John Deere crop sprayer and a school bus. The sprayer, which is insured by Tennessee Farmers Mutual Insurance Company as subrogee of the owner, Appellee Kenneth L. Couch, was driven by Mr. Couch's employee, Cameron Martin.  The school bus, which is owned by Appellant Jackson Madison School System Board of Education, was driven by its employee, Lawrence Davis.  The trial court held that Mr. Davis was negligent in failing to appreciate the situation so as to "take reasonable action to avoid an accident."  We conclude that the evidence preponderates against the trial court's finding of negligence on the part of Mr. Davis.  Accordingly, we reverse the judgment of the trial court and remand for entry of judgment in favor of Appellant.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J.,  joined.

Jon A. York and Nathan D. Tilly, Jackson, Tennessee, for the appellant, Jackson Madison School System Board of Education.

Jay G. Bush, Jackson, Tennessee, for the appellee, Kenneth L. Couch.

## OPINION

### I. Background

On April 26, 2012, Cameron Martin was operating a sprayer owned by Appellee Kenneth L. Couch and insured by Tennessee Farmers Mutual Insurance Company ("TFMIC").[1] Mr. Martin was travelling east on Lower Brownsville Road in Madison County near the intersection of Westover Road. Lower Brownsville Road is a rural public road without a painted line demarcating the east and westbound lanes of traffic. The shoulder along the eastbound lane is narrow due to a ditch and embankment on that side of the road. The sprayer, which is wider than half the width of Lower Brownsville Road, was encroaching onto the westbound lane of the road.[2] As the sprayer was travelling eastbound, the school bus, which was owned by Jackson Madison School System Board of Education ("Appellant," or "JMSSBE") and was driven by JMSSBE's employee, Lawrence Davis, turned onto Lower Brownsville Road and began to travel west.[3] The shoulder along the westbound lane of Lower Brownsville Road is unpaved; however, there is no ditch or embankment on that side of the road.

The sprayer was able to pass the school bus without contact. However, immediately after passing the bus, the shoulder gave way, causing the sprayer to veer into the ditch. On April 26, 2013, TFMIC, as subrogee of Mr. Couch, filed suit against JMSSBE for negligence on the part of its employee, Mr. Davis. In relevant part, the complaint alleged that:

---

[1] Prior to trial, the parties stipulated that at all times relevant to this action, Mr. Martin was an employee of Mr. Couch and was acting in the course and scope of his employment.

[2] Tennessee Code Annotated Section 55-7-202(a)(1) provides:

No motor vehicle as defined in § 55-1-103 or any trailer or semitrailer, whose width, including any part of the load, exceeds eight feet (8′) (that is, four feet (4′) on each side of the center line of the vehicle), or whose height, including any part of the load, exceeds thirteen and one-half feet (13 1/2′), shall be operated on any highway; provided, that this section **shall not apply to farm tractors or farm machinery temporarily moving on any highway**.

(Emphasis added).

[3] The parties also stipulated that Mr. Davis was, at all times relevant to this action, an employee of JMCSSBE and was acting in the course and scope of his employment.

2

8. Mr. Martin had slowed the sprayer to approximately 15 miles per hour as he approached Westover Road. As Mr. Martin slowed the sprayer he observed the [JMSSBE] school bus turning right from Westover onto Lower Brownsville Road. Mr. Martin attempted to pull the sprayer as far to the right as possible to allow the school bus to pass.

9. After turning from Westover onto Lower Brownsville Road, the operator of the [JMSSBE] school bus failed to exercise reasonable care by driving the bus at a rate of speed excessive under the circumstances and failing to yield and/or slow and move the bus to the right to allow the sprayer to safely pass.

10. Mr. Martin maneuvered the sprayer into a ditch on the right to avoid a collision with the school bus which never slowed down or stopped. . . .

Based upon the foregoing averments, TFMIC alleged the following acts of negligence on the part of Mr. Davis:

a. Negligently failing to use that degree of care and caution in the operation of his vehicle as was required of a reasonable and prudent person under the same or similar circumstances at the time and place of the accident;

b. Negligently failing to keep a proper look out for other vehicles.

c. Negligently failing to devote full time and attention to the operation of his vehicle.

d. Negligently operating his vehicle in a reckless manner.

Although Mr. Martin was not injured, prior to trial, the parties stipulated that Mr. Couch had suffered $43,239.47 in damage to the sprayer.

On June 13, 2013, JMSSBE filed its answer denying any negligence or liability for the accident. Specifically, JMSSBE averred that "[t]he sole or majority of proximate cause of the injuries Plaintiff allegedly sustained is a result of Plaintiff's acts or omission." The case was tried, without a jury, on October 7, 2014. On October 24, 2014, the trial court entered judgment in favor of Mr. Couch in the amount of $43,239.47.

## II. Issues

JMSSBE appeals. It raises two issues for review as stated in its brief:

3

1. Whether [JMSSBE], through the action of its employee, acted negligently in operating a school bus and actually caused Cameron Martin, an employee of [TFMIC's] insured, to crash a crop sprayer into a ditch.

2. Whether the trial court erred in not allocating any fault to Cameron Martin.

### III. Standard of Review

This case was tried without a jury. Accordingly, we review the findings of fact made by the trial court de novo, with a presumption of correctness unless the preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d). The trial court's conclusions of law, however, are reviewed de novo and "are accorded no presumption of correctness." *Brunswick Acceptance Co., LLC v. MEJ, LLC*, 292 S.W.3d 638, 642 (Tenn. 2008). Furthermore, when the resolution of an issue in a case depends on the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See Whitaker*, 957 S.W.2d at 837; *McCaleb*, 910 S.W.2d at 415; *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

### IV. Analysis

The plaintiff in an action for negligence, which is generally defined as the failure to exercise reasonable care, must establish five essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Housing Authority*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.1995)).

In its October 24, 2014 order, the trial court made the following relevant findings concerning negligence:

3. The Court finds that all drivers have a duty to drive with reasonable care, to maintain a safe speed, and to use reasonable care to avoid an accident by seeing and being aware of what is in the driver's view.

4

4. The Court finds the testimony of the independent witness, Myra Davis, to be credible. Ms. Davis testified that she had been driving behind the spray rig . . . since turning onto Lower Brownsville Road. Ms. Davis testified that the spray rig was not speeding. Ms. Davis further testified that the driver of the spray rig was attempting to get over to the right. This testimony was corroborated by the photographs in Collective Exhibit 1, specifically photographs 24, 25, and 32, showing the tire tracks of the spray rig off the pavement. The school bus video (Exhibit 2) also showed the spray rig was off the pavement on [the] right side of the road.

5. The Court finds that Ms. Davis testified that the accident happened just a few seconds after the bus turned onto Lower Brownsville Road. This testimony was further corroborated by the photographs showing the accident happening just up from the intersection and from the video on the school bus camera in Exhibit 2.

6. The Court finds that Ms. Davis further testified that she never saw the bus try to move over to the right side to avoid the accident. It appears from reviewing photographs 22, 23, 26, 29, and 32 of Collective Exhibit 1 that there was space for the bus driver, Mr. Davis, to pull off the road to avoid this accident. In reviewing the photographs there was space, not only right when Mr. Davis turned the school bus onto Lower Brownsville Road, but Mr. Davis had substantially more shoulder than the driver of the spray rig who appeared to have just one foot or so of space and then a ditch.

7. The Court finds that Mr. Lawrence Davis, the driver of the school bus, testified that he saw the spray rig as soon as he turned onto Lower Brownsville Road; however, Mr. Davis never moved the bus over to avoid the accident. The photographs in Collective Exhibit 1 show that there was more room to move off the road on Mr. Davis' side of the road than on the spray rig's side of the road.

8. The Court finds that the operator of the spray rig, Cameron Martin, testified that he was traveling down Lower Brownsville Road and saw the school bus turn from Westover Road onto Lower Brownsville Road. Mr. Martin testified that he started slowing down and moving over as far as he could onto the right shoulder. Mr. Martin further testified that he had his right side wheels going into the ditch and stated that the school bus did not pull over prior to the spray rig passing. Mr. Martin further testified that he could have stopped the spray rig completely if he thought that the bus would not stop, but he only had a split

5

second to make a decision.

9. The Court finds that the school bus video (Exhibit 2) shows that the driver of the school bus did not start slowing down until he was almost to the spray rig and that Mr. Davis appeared not to appreciate the situation at hand. Therefore, the court finds that Mr. Davis was negligent in failing to take reasonable action to avoid an accident under the circumstances that existed at the time of the accident and that Mr. Davis could have foreseen an accident happening through the use of reasonable care.

## A. Relevant Evidence

At the trial, Mr. Martin testified that the sprayer was run by a "hydraulic pump, which pumps hydraulic fluid to each hydraulic motor on each tire." "[T]he only thing the motor really does is control the hydraulic pump." The operational mechanism of the sprayer is important in that, in order to run properly, the sprayer operator must "throttle the motor completely wide open." Mr. Martin testified that he could "control the speed with the throttle," but that the sprayer has "an emergency brake . . . that actually controls the back two tires." When asked how much distance he would need to stop the sprayer when he was running it at full throttle, Mr. Martin stated that "[t]o a complete stop, I would say 70, 80 yards . . . ." Mr. Martin testified that he was operating the sprayer at "17, 18 miles-an-hour . . . . ." Concerning the circumstances of the accident, Mr. Martin testified, in relevant part, as follows:

As I was traveling down the road—like I said, I was heading to Boone Lane. When I got closer to the end of the road, I had started slowing up to turn. And I'm going to say I was probably 70, 80 yards from the turn. The school bus turned in. And I noticed that, so I got over as far as I could, common courtesy. And I seen [sic] that he never was going to stop. He just kept coming. He just kept coming.

And, finally, I felt like I was either going to hit him or I was going to have to do something to prevent hitting him. So in that case I got over as far as I could. When I did, the ground gave away, and I hit the ditch.

Mr. Martin opined that he had slowed to seven or eight miles-per-hour by the time he went off the roadway and that "[a]s [he] was passing the school bus, [his] wheels were going off into the ditch. . . ." Mr. Martin went on to testify that:

If I would have known that he wasn't going to stop ahead of time from then, I probably could have stopped completely. Still wasn't going to be able to pass

6

one another in that spot right there. I mean, he turned in, I would think, obviously faster than you should. I mean, it was just one of those split-second deals, you know. I had to make up my mind one way or the other, hit the bus or hit the ditch.

In his direct testimony, Mr. Martin stated that the sole cause of the accident was the fact that the school bus did not pull off the road:

Q. Is there any way this accident could have been avoided?

A. Yes, sir.

Q. How do you think it could have been avoided?

A. If the school bus could have possibly pulled over.

On cross-examination, however, Mr. Martin testified:

Q. Mr. Martin, if you had brought the crop sprayer to a complete stop as the bus was approaching, is that another way the accident could have been avoided?

A. Yes, sir.

Q. Now, how fast were you going when you noticed the bus turning onto Lower Brownsville Road?

A. When I noticed the bus coming, I'm going to say 17 to 18 miles-an-hour. I was coming up to a—to stop.

Q. And I believe you stated that you were probably about 70 or 80 yards from the intersection when you first noticed the bus?

A. Correct.

Q. And I think you also testified that you need about 70 to 80 yards to come to a complete stop.

A. Right, if traveling wide open 30 miles-an-hour.

Q. And you say that you were driving around 17, 18 miles-an-hour?

A. Correct.

Ms. Myra Davis (no relation to Mr. Lawrence Davis) also testified at trial. As set out in its order, *supra*, the trial court specifically found that Ms. Davis' testimony was credible. In relevant part, Ms. Davis testified that she was behind the sprayer as it traveled down Lower Brownsville Road. She stated that, as she and the sprayer approached the end of the road, the bus turned onto Lower Brownsville Road. "And the sprayer, he was trying to get over to let the bus come by, and he got on the shoulder of the road, and he went over into the ditch. The bus went by, it went on . . . ." Ms. Davis further stated that she did not believe the sprayer was operating at an excessive speed.

Mr. Lawrence Davis, the driver of the school bus, testified that when he turned the bus onto Lower Brownsville Road, he observed that the "sprayer was approximately about five or six houses down the road . . . ." The school bus was equipped with three cameras, showing three different angles. The video from these cameras was admitted at the hearing as Trial Exhibit 2. Trial Exhibit 2 also contains a GPS recording, showing the bus' location and speed. Mr. Davis testified that, after turning onto Lower Brownsville Road, he accelerated to approximately sixteen miles per hour. The GPS data indicates that, at the time the sprayer began to pass the bus, i.e., when the sprayer's tire was visible on the video, the bus had slowed to four miles-per-hour. Immediately after the sprayer passes, the GPS indicates that the bus came to a complete stop that lasted approximately three to four seconds. After the sprayer passed, the GPS shows the bus accelerating to one mile-per-hour. The GPS data, coupled with the video evidence, indicates that Mr. Davis did, in fact, slow the bus to a gradual stop, but that he did not pull the bus onto the shoulder. It is undisputed that the sprayer left the road only after it had cleared the bus. Mr. Davis testified that, after the sprayer went into the ditch, he did not stop the bus, or call for help. Rather, he stated that he did not stop or call for help "because [the sprayer] did not make any contact with the bus."

Mr. Davis further testified:

Q. Would you agree that the intersection has enough room for a vehicle to pull off to the side if there's a wider vehicle approaching from the opposite lane?

A. Not in particular a school bus. I would say no, sir, it is not.

* * *

Q. You would agree, though, that yielding to a wider agricultural vehicle,

8

that's your protocol as a [JMSSBE] bus driver; is that correct?

A.  Correct.

*   *   *

Q.  Okay.  And you knew that that sprayer was approaching as you turned onto Lower Brownsville Road; is that correct?

A.  That is correct.

On cross-examination, Mr. Davis testified:

Q.  Now, when you turned onto Lower Brownsville Road, I believe you testified that you saw the crop sprayer about five or six houses down the road?

A.  Yes, sir.

Q.  Did you consider that to be nearby to you?

A.  Not at that particular time, no, sir, I did not.

Q.  Could you tell what speed the sprayer was operating at?

A.  It looked like it was coming at a pretty good rate of speed.

In fact, the video evidence shows the sprayer passing the bus at a considerably greater speed than the bus is traveling.  Mr. Davis testified that it did not look like the sprayer was slowing down as it approached the bus.  On redirect, Mr. Davis clarified that "the road there is very narrow.  And, like I say, when I pulled in that entrance, I went down a little piece, like I said, about two or three houses and pulled the bus as far to the right as I could."  He was then asked whether "there was room anywhere along that road before you met the sprayer where you could have pulled that bus to the right?"  He answered: "As far as my recollection, I did pull the bus as far to the right as I could have."

## B.  Breach of Duty

From its order, it appears that the trial court primarily focused on the prima facie elements of duty and breach in reaching its conclusion that Mr. Davis was negligent.  In Paragraph 3 of its order, *supra*, the court sets out the duty requirement.  As discussed in

*Rowland v. Metropolitan Government of Nashville*, No. M2012–00776–COA–R3–CV, 2013 WL 784582 (Tenn. Ct. App. Feb. 28, 2013):

> [T]he appropriate standard of care for school bus drivers is not the standard of care applicable to common carriers. Our Supreme Court has made clear that a school system does not have the same duty of care as a common carrier, which must exercise the "highest practical degree of care." *Hawkins Cnty. v. Davis*, 216 Tenn. 262, 391 S.W.2d 658, 663 (Tenn.1965). Rather, a school bus driver has a duty "to exercise reasonable and ordinary care under the circumstances." *Traylor v. Coburn*, 597 S.W.2d 319, 321 (Tenn. Ct. App. 1980). When a school bus is transporting young children, reasonable and ordinary care under the circumstances "requires that the driver exercise special care proportionate to the age of the child and its ability, or lack of ability, to care for itself." *Hawkins*, 391 S.W.2d at 660.

*Id*. at *9.

As discussed above, the instant case arose when the sprayer and the bus met on a narrow road. Tennessee Code Annotated Section 55-8-116 addresses passing vehicles proceeding in opposite directions. The statute provides:

> Drivers of vehicles proceeding in opposite directions shall pass each other to the right, and upon roadways having width for not more than one (1) line of traffic in each direction, each driver shall give to the other at least one half (1/2) of the main-traveled portion of the roadway as nearly as possible.

8 Am. Jur. 2d Automobiles § 817 states, in relevant part, that:

> In cases involving meeting at narrow places in a street or road, if one of the approaching drivers has an opportunity to stop at a wide place in the road while the other does not, the driver having such an opportunity might be chargeable with negligence in continuing ahead into the narrow passage. Findings of negligence have been sustained upon evidence that one or the other of the vehicles meeting on a narrow road failed to yield half of the roadway.

> As in other cases, the mere possession of the right of way at a point where the road has been narrowed by obstructions does not entitle a driver to continue blindly ahead into a collision where he or she can avoid the accident by the exercise of reasonable care.

***Id***. (footnotes omitted).   Likewise, 60A C.J.S. <u>Motor Vehicles</u> § 709 provides:

> Vehicles approaching each other from opposite directions must keep to the right. While this rule is based on custom, exists independently of any statutory provisions, and applies to vehicles of every character, it is very generally embodied in statutes or ordinances regulating traffic. Such statutes are mandatory.  Statutes requiring motorists to drive as near as possible to the right-hand edge of a highway are not intended for the protection of vehicles proceeding in opposite directions.
>
> Under the rule, the duty of each driver is to allow the other vehicle room for a clear passage by turning or keeping the vehicle to the right of the center of the traveled portion of the highway whenever it is practicable to do so. A driver who is already in such position on the highway should maintain such position until the other vehicle has passed. A driver who is in the center or on the left-hand side of the road should turn to the right of the center in ample time to permit the other vehicle to pass freely without the necessity of slackening its speed.

***Id***. (footnotes omitted).  "However, the general rule applies only when the vehicles involved are of customary dimensions, and the rule is inapplicable in cases where one of the vehicles is overwide, and this is the sole reason why the vehicles cannot pass on the bridge or passageway." 60A C.J.S. <u>Motor Vehicles</u> § 714 (citing ***Yell v. Wooten***, 362 P.2d 1102 (Okla. 1961)).

It is undisputed that Mr. Davis pulled the bus to the edge of the pavement.  Indeed, the video evidence clearly shows that the bus is completely to the far right of the westbound lane of Lower Brownsville Road.  We find no precedent that would require Mr. Davis to pull the bus completely off the roadway into some person's yard in order to allow the sprayer to pass.  In fact, here, it was the sprayer that was encroaching into the westbound lane that was occupied by the bus.  In the face of this situation, Mr. Davis (as evidenced by the video from the bus) slowed the bus to four miles-per-hour.  Under these facts, it is difficult to conclude that Mr. Davis breached a duty concerning roadway safety.

However, even if we assume, *arguendo*, that Mr. Davis breached a duty, a breach of duty, alone, will not satisfy the prima facie requirements for a showing of negligence.  From its order, it appears that the trial court did not analyze each of the prima facie elements of negligence in reaching its conclusion that Mr. Davis was negligent.  However, by holding that Mr. Davis was negligent, the trial court inferentially found that TFMIC had, in fact,

11

proven all of the prima facie requirements of the tort. ***Kilpatrick v. Bryant***, 868 S.W.2d 594, 598 (Tenn. 1993) ("No claim for negligence can succeed in the absence of any one of [the prima facie] elements."). However, after our review of the record, we are particularly concerned with whether TFMIC has proven the elements of causation in this case.

## C. Causation

Cause in fact and proximate causation are questions to be determined by the finder of fact. ***Haynes v. Hamilton Cnty***., 883 S.W.2d 606, 612 (Tenn.1994). In order to succeed in its claim, TFMIC would have to show that Mr. Davis' alleged failure to avoid the accident (by slowing down, stopping, or moving the bus from the roadway) was both the cause in fact and the proximate cause of the accident. *See **Hale v. Ostrow***, 166 S.W.3d 713, 718 (Tenn. 2005) ("Causation [in fact] and proximate cause are distinct elements of negligence, and both must be proven by the plaintiff by a preponderance of the evidence.") (quoting ***Kilpatrick***, 868 S.W.2d at 598). As this Court has explained:

> The distinction between cause in fact and proximate, or legal, cause is not merely an exercise in semantics. The terms are not interchangeable. Although both cause in fact and proximate, or legal, cause are elements of negligence that the plaintiff must prove, they are very different concepts. ***Ridings*** [***v. Ralph M. Parsons Co.***,] 914 S.W.2d [79,] 83 [(Tenn. 1996)]; ***Kilpatrick v. Bryant***, 868 S.W.2d 594, 598 (Tenn. 1993). Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss. Thus, cause in fact deals with the "but for" consequences of an act. The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct. ***Kilpatrick***, 868 S.W.2d at 598. In contrast, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. ***Id***. Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and "our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient." ***Bain v. Wells***, 936 S.W.2d 618, 625 (Tenn. 1997); ***George v. Alexander***, 931 S.W.2d 517, 521 (Tenn. 1996); ***Kilpatrick***, 868 S.W.2d at 598; ***Smith v. Gore***, 728 S.W.2d 738, 749 (Tenn. 1987).

***Snyder v. LTG Lufttechnische GmbH***, 955 S.W.2d 252, 256 n.6 (Tenn. 1997).

17 John A. Day, Donald Capparella, & John Walker Wood, Tennessee Practice Series Tennessee Law of Comparative Fault §6:3 (2d ed. 2014) contains the following discussion on cause in fact:

> A plaintiff must prove that plaintiff's injury or harm would not have occurred "but for" the defendant's negligent conduct. Cause in fact must be proved by the party bearing the burden of proof by a preponderance of the evidence. Stated differently, the party with the burden of proof must demonstrate that the negligence more likely than not caused the injury. As the Supreme Court said in *Lindsey v. Miami Development Corp*.:
>
> > The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant. . . .
> >
> > The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not . . .
>
> It is important to note that there can be multiple causes of one injury, and there is no requirement that a cause of an injury "be the sole cause, the last act, or the one nearest to the injury." In the words of the court of appeals:
>
> > The rule is well established in this State that if an injury occurs from two causes, both due to the negligence of different persons, but together constituting an efficient cause, all persons whose acts contribute to the injury are liable therefor, and the negligence of one does not excuse the negligence of the other.
>
> Dean Prosser defines the "but for" test as follows: "The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of an event, if the event would have occurred without it."

13

*Id*. (footnotes omitted).

On the other hand, proximate cause focuses on "whether the policy of the law will extend responsibility for that negligent conduct to the consequences that have occurred." *Kilpatrick*, 868 S.W.2d at 598. As this Court has stated, "'legal responsibility must be limited to those causes which are so closely connected with the result and are of such significance that the law is justified in imposing liability.'" *Id*. (quoting *Doe v. Linder Const. Co., Inc*., 845 S.W.2d 173, 181 (Tenn.1992); and Prosser and Keeton, The Law of Torts 264 (5th ed.1984)). Proximate cause is the means by which courts determine where that boundary will lie. *Id*. "Proximate cause puts a limit on the causal chain, such that, even though the plaintiff's injury would not have happened but for the defendants' breach, defendants will not be held liable for injuries that were not substantially caused by their conduct or were not reasonably foreseeable results of their conduct." *Hale*, 166 S.W.3d at 719 (citing *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn.1994)). "Proof of negligence without proof of causation is nothing." *Doe v. Linder Const. Co., Inc.*, 845 S.W.2d at 181 (quoting *Drewry v. Cnty. of Obion*, 619 S.W.2d 397, 398 (Tenn. Ct. App.1981)).

In Tennessee, courts use a three-pronged test to assess proximate cause: (1) the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence. *Hale*, 166 S.W.3d 713, 719 (citing *Haynes*, 883 S.W.2d at 612).

In the instant case, it is undisputed that the bus never made contact with the sprayer. The lack of contact, however, is not dispositive on the question of causation. For example, in *South v. Roberts*, No. 03A01-9611-CV-00375, 1997 WL 367233 (Tenn. Ct. App. June 30, 1997), plaintiff's decedent lost her life when a car driven by Roberts struck the car in which the decedent was riding. South alleged that Roberts was racing another driver, Cannon. The Cannon vehicle never came into contact with decedent's vehicle. At the close of the proof, the trial judge granted a verdict for Cannon. The plaintiff then settled with Roberts and appealed the dismissal of Cannon. This Court reversed and remanded for a new trial, saying that "[a] factfinder could reasonably infer that Cannon incited and encouraged Roberts to drive in a fast and reckless manner, and they were jointly engaged in a series of acts which directly led to the collision, and that Cannon's acts were a contributing proximate cause to the accident." *Id*. at *4. Although the Court used the phrase "proximate cause," it really was referring to cause in fact. *Id*. The *Roberts* holding demonstrates that the actions of a person who participates in an illegal drag race can be deemed to be a cause in fact of injuries or

14

death to another even if his or her vehicle does not actually collide with the plaintiff's person or vehicle. Stated differently, cause in fact may be found even absent physical impact between a negligent defendant and the plaintiff.

Turning back to the record, when he saw the sprayer approaching, Mr. Davis slowed to approximately 4 miles-per hour and pulled the bus to the right edge of the roadway. In the absence of any law requiring Mr. Davis to leave the roadway or even to pull the bus partially onto the shoulder, Mr. Davis did what he was required to do, which was to slow his speed and keep to the far right of the road. On the other hand, although Mr. Martin testified that he appreciated the fact that the bus was occupying the westbound lane and the fact that the sprayer occupied more than half the roadway, he took no immediate action to bring the sprayer to a stop. Rather, as set out in the foregoing testimony, he continued travelling toward the bus at approximately fifteen miles-per-hour. Mr. Martin further testified that he was capable of stopping the sprayer before he attempted to pass the bus. This he did not do. Rather, he continued his progression down the narrow road knowing that the bus was there and apparently expecting Mr. Davis to pull the bus off the roadway to accommodate the sprayer. Mr. Martin testified that the accident could have been avoided if he had brought the sprayer to a stop. The evidence, in this regard, preponderates in favor of a finding that the cause in fact of the accident rests with Mr. Martin's actions, or lack thereof.

Further, a subtle point adduced in Mr. Martin's testimony indicates that the cause of the accident was not the location of the bus. The sprayer had completely passed the bus when it went off the roadway. In his testimony, set out in full context above, Mr. Martin states, "I got over as far as I could. When I did, **the ground gave away, and I hit the ditch**." (Emphasis added). Based upon his testimony, Mr. Martin had to move the sprayer's right tires off the road in order to pass the bus. So, we may reasonably assume that, at the instance the sprayer passed the bus, its tires were already off the paved road; otherwise, there would have been some contact between the sprayer and the bus. In fact, Mr. Martin testifies that he "got over as far as I could," as soon as he saw the bus turn onto Lower Brownsville Road. Here, the sprayer undisputedly cleared the bus, and, as Mr. Martin testified, it was not until the sprayer was past the bus that it went into the ditch. Mr. Martin stated that the sprayer went into the ditch when "the ground gave way" at some point **after** he passed the bus. Accordingly, the evidence indicates that it was not the fact that the sprayer's tires were off the pavement due to the bus' location that caused the accident, but rather the fact that the ground gave way at the place where the sprayer went into the ditch. Additionally, there is no indication that after clearing the bus, Mr. Martin attempted to move the sprayer's tires back onto the pavement. Perhaps there was no time to do so, but this would likely be due to the sprayer's speed, or lack of maneuverability. Regardless, Mr. Martin's failure to correct the sprayer back onto the road cannot be attributed to any action or inaction on Mr. Davis' part.

From the totality of the circumstances, we conclude that the evidence preponderates against the trial court's finding that Mr. Davis was negligent. Specifically, we conclude that the evidence is insufficient to establish the prima facie elements of cause in fact and proximate cause, which are Mr. Couch's burdens. Having determined that the evidence does not support the prima facie claim for negligence, we pretermit the remaining issue concerning comparative fault.

## IV. Conclusion

For the foregoing reasons, we reverse the order of the trial court. We remand the case for entry of judgment in favor of the Appellant, Jackson Madison School System Board of Education, and for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellee, Kenneth L. Couch, for which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE

16